592 So.2d 1277 (1992)
John A. CASON, Appellant,
v.
Ruth L. CASON, Appellee.
No. 91-1108.
District Court of Appeal of Florida, Fifth District.
February 14, 1992.
*1278 John A. Baldwin, Baldwin & Morrison, P.A., Fern Park, for appellant.
Frank A. Taylor, Orlando, for appellee.
PER CURIAM.
AFFIRMED. See Canakaris v. Canakaris, 382 So.2d 1197 (Fla. 1980). See also Bedell v. Bedell, 583 So.2d 1005 (Fla. 1991); Hamlet v. Hamlet, 583 So.2d 654 (Fla. 1991); Marcoux v. Marcoux, 464 So.2d 542 (Fla. 1985); Walter v. Walter, 464 So.2d 538 (Fla. 1985); Linn v. Linn, 523 So.2d 642 (Fla. 4th DCA), rev. denied, 534 So.2d 400 (Fla. 1988).
COWART and DIAMANTIS, JJ., concur.
HARRIS, J., dissents with opinion in which COWART, J., concurs specially with opinion.
HARRIS, Judge, dissenting.
In 1983 John and Ruth Cason, after a fourteen year marriage, had marital assets (after deduction of marital liabilities) of approximately $123,000. Of this, the equity in the marital home amounted to about $67,000. John was employed as a commission salesman whose area was central/south Florida. He was on the road four nights a week spending his evenings in hotels or motels within his sales area. He earned $53,000 a year gross commission with traveling expenses of $25,000 per year or a net income, including taxes and social security, of $28,000 per year. Ruth was unemployed.
The parties divorced in 1984, and it appears that the marital assets were evenly divided in a detailed separation and property settlement agreement. The husband was awarded the marital home and the wife was awarded a separate lot, a second mortgage and $12,000 cash to equalize the equity in the marital home. The husband agreed to pay $800 per month alimony.
In 1988 the company employing John went out of business. John was able to find another commission salesman job paying approximately $20,000 per year gross with a net (after deducting traveling expenses) of $8,000 per year. In 1990 John, now 61 years old, had surgery for colon cancer and separate surgery for the removal of a nonmalignant tumor. He was out of work for over six months and ultimately was released as a salesman from the second employer. Although he has sent out many resumes, he has since been unable to find employment. He moved to modify his alimony obligation.
After the divorce the husband sold the marital home. He and his new wife acquired a new home valued at $350,000. Although John testified that his new wife made the $100,000 plus down payment on the new home from her separate trust fund, he was unable to account specifically as to what he had done with the equity proceeds from the marital home other than making $2,200 per month payments on the new home and paying "other debts." In addition, he transferred his interest in the new home to his current wife shortly before filing the modification petition.
This undoubtedly, but I believe improperly, greatly influenced the trial court to deny any relief from the alimony obligation. The court stated:
Well, I'll tell you, it appears that the wife got some assets in this divorce and she has been frugal with her assets. She has saved them, therefore, she has some money left.[1]
On the other hand, he has made payments on a house, a three hundred fifty thousand dollar house that he has made some payments for some period of time up until July, we know, of twenty-two hundred dollars a month.
Now, if he wants to do that, that's his option. But, she's living on three hundred *1279 eighty-four dollars. He was living to the tune of twenty-two hundred dollars just on the mortgage payments. Then, he takes his name off that after three years and puts it in his wife's name.
As far as I can see he's depleted what assets he had. He spent the money rather than saving it in an account as she has done. If he had done this, he wouldn't be living off his present wife. Apparently his present wife carries him. And that's his choice and her's too.
But I see nothing but a deliberate depletion of his assets when he signed that house over to his present wife after he had been on the title, on the deed.
And, I am not going to reduce the amount of alimony.
The court made no finding that this 61-year-old man who had recently had two surgeries, one for colon cancer, voluntarily terminated his employment or that he can continue to spend four nights a week on the road and, even in this recession, earn the income he enjoyed at the time the $800 per month alimony was established. The record would not support such a finding in any event. To the contrary, the court found that the former husband deliberately depleted his assets by continuing to make the monthly mortgage payment on the new home purchased by him and his new wife even after financial and health misfortune fell. Of course, we are talking about the assets awarded to him as a part of the equitable distribution in the prior dissolution action. Before this case, it was assumed that the husband had the same rights to save or spend his distributed assets as the wife did. The clear implication of this case is that the former husband should have retained his share of the previously awarded marital assets in order to pay alimony to the former wife in the event he lost his employment. In other words, the court found that the former wife is entitled to her half of the former marital assets as an equitable distribution and is entitled to a lien on the former husband's equitable distribution to insure that her alimony will continue even if the income base for the alimony disappears.
This concept goes far beyond any goosegander fairness test.
I acknowledge and share in the concern of the special concurring opinion that a trial judge's ruling on alimony and equitable distribution has become, practically speaking, appeal proof. However, the supreme court in Marcoux v. Marcoux, 464 So.2d 542 (Fla. 1985) insists that the appellate court still has a role in domestic appeals  even if a limited role. In that light, I have analyzed the "judgment as a whole" and I have considered "the parties' earning ability, age, health, education, the duration of the marriage, the standard of living enjoyed during the marriage and the value of the parties' estate."[2] Having done so  and based on the trial court's stated reason for denying relief, I find the judgment of the trial court to be "arbitrary or unreasonable,"[3] because there is no "logic and justification for the result."[4]
I would reverse.
COWART, J., concurs specially with opinion.
COWART, Judge, concurring specially in the dissent.
I agree with Judge Harris' dissent. He and I, as trial judges, would have reached a different result in this domestic relations case.
However, this is but another of many cases that are, and, under present law, must be affirmed in the appellate court not because the result is fair but because of constrictions imposed in Florida on the intermediate *1280 appellate courts' scope of review of trial court action in domestic relations cases. See Hamlet v. Hamlet, 583 So.2d 654 (Fla. 1991); Canakaris v. Canakaris, 382 So.2d 1197 (Fla. 1980). Under practice and procedure prior to Canakaris, while trial judges had great discretion in domestic relations cases, appellate courts in reviewing such cases established generalized legal principles that tended to harmonize the natural wide range of divergent views on the trial court level and to result in more equality and uniformity and less disparity and less diversity in result. With the limitations imposed by Supreme Court cases, district courts of appeal are now constrained to affirm results which deviate in both directions from the center of an extremely broad standard, (i.e., a result that no reasonable judge would agree with) and this in the face of the fact that always one judge  the trial judge himself  has already reached the result being reviewed. In effect now to reverse a general domestic relations decision relating to equitable distribution, alimony, custody, or child support, the district courts of appeal must find and adjudicate that the trial judge was unreasonable, arbitrary and capricious in reaching his decision. This is not a very fair or workable standard of review and one that forces affirmance of the divergent subjective views of a broad assortment of trial judges who, like all humans, have widely different educations, life experiences, and personal, professional and philosophical views as to what is fair, what the marriage relationship is or should be, and as to the social and legal objectives involved in resolving the controversies that arise as differing interests compete when a marriage relationship is being dissolved. Hopefully a better, more definite and objectively oriented statement of legal principles will, in time, be found and adopted but that hope is stifled by controlling cases which prevent the five district courts of appeal from functionally acting as crucibles or laboratories in which difficult legal problems are first addressed, different solutions are proposed and the best is then selected and adopted by the Supreme Court as the law of the whole State of Florida.
NOTES
[1] Ruth's financial affidavit showed total assets (after deducting liabilities) of $91,000 including $73,000 in liquid assets. Her estate has increased by almost 50% since the dissolution. This would indicate to most observers that not only has the former husband's ability been reduced, but also that the former wife's needs are less.
[2] Canakaris v. Canakaris, 382 So.2d 1197 (Fla. 1980).
[3] Hamlet v. Hamlet, 583 So.2d 654 (Fla. 1991).
[4] Marcoux v. Marcoux, 464 So.2d 542 (Fla. 1985).